**NORTHLAND INSURANCE COMPANY,**
Plaintiff–Appellant,

v.

**GUARDSMAN PRODUCTS, INC.,**
Defendant–Appellee.

No. 97–1023.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 12, 1997.

Decided March 31, 1998.

Rehearing Denied April 22, 1998.

Paul B. Hines (briefed), Galbraith & Booms, Southfield, MI, Craig E. Farmer (argued and briefed), Frank J. Torrano (briefed), Farmer & Murphy, Rancho Cordova, CA, for Plaintiff–Appellant.

Peter L. Gustafson, Norbert F. Kugele (argued and briefed), Warner, Norcross & Judd, Grand Rapids, MI, for Defendant–Appellee.

Before: RYAN, COLE, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court, in which COLE, J., joined. RYAN, J., concurred in the judgment only.

## OPINION

CLAY, Circuit Judge.

Appellant, Northland Insurance Company ("Northland") appeals from the district court's orders granting appellee's, Guardsman Products, ("Guardsman") motion for summary judgment and denying Northland's motion for summary judgment. For the reasons set forth below we **AFFIRM** the district court's judgments.

## I. Statement of the Facts

Guardsman was a manufacturer of paints, lacquers, and other wood finish products; it had its principal place of business in Michigan.[1] In 1984, Guardsman negotiated with McAlear Associates ("McAlear"), an insurance broker also located in Michigan, to purchase insurance from Northland, a Minnesota company. McAlear had an agency agreement with Northland, thus, Guardsman ordered Northland's insurance coverage through McAlear. McAlear billed Guardsman for the insurance premiums and Guardsman paid McAlear the required payment.

McAlear sold various Northland insurance policies to Guardsman for three years. The specific policy at issue in this case, is a products liability policy which covered the period from December 15, 1984 to December 15, 1985 and has a $550,000 limit of liability for each occurrence. In assessing whether to underwrite the products liability policy, Northland took into consideration the fact that Guardsman had manufacturing plants in several states, including California, and sold its products worldwide. Northland noted, however, that in assessing the risk "the manufacturing location is less relevant than where a product may be purchased, consumed, [and] distributed." (J.A. at 472.)

The policy at issue provides, in relevant part, the following:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence, if the bodily injury or property damage is included within the completed operations hazard or the products hazard, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage. . . .

(J.A. at 410.)

5. Other Insurance: The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

(J.A. at 402.)

The policy also included a Certificate of Facultative Reinsurance and a Hold Harmless Agreement. (J.A. at 417–420.) The reinsurance certificate was issued by G.C.I.; it requires Guardsman to pay a $50,000 self-insured retention ("SIR") for each occurrence. Details Of Reinsurance Afforded is as follows:

| TYPE OF INSURANCE ITEM 1 | POLICY LIMITS & APPLICATION ITEM 2 | REINSURER RETENTION ITEM 3 | REINSURANCE ACCEPTED ITEM 4 | BASIS OF ACCEPTANCE ITEM 5 |
|---|---|---|---|---|
| Products Liability | 550,000/700,000 Combined Single Limit | 50,000 each occurrence 200,000 annual aggregate | 100% of the limits as stated in Item 3 | Primary coverage stated in Item 3 |

(J.A. at 417.)

Moreover, in the hold harmless agreement, Guardsman agreed "not to pursue against the Northland Insurance Company . . . any claim or claims . . . under or against or arising out of the first $50,000/200,000 occurrence/aggregate for Products Liability. . . ." (J.A. at 419.)

In 1988, Guardsman was sued by CorryHiebert, a manufacturer of commercial office furniture products. CorryHiebert's principal place of business is in California. CorryHiebert filed suit, in California district

---

1. Guardsman has been acquired by Lilly Industries, but for the purposes of this appeal I will continue to refer to appellee as Guardsman.

court, on September 14, 1988. CorryHiebert contended that beginning sometime in 1984, Guardsman sold and delivered defective lacquer to CorryHiebert's California plant, and that CorryHiebert used the defective lacquer on its office furniture products. CorryHiebert alleged several claims, but only pursued claims for breach of express warranty, and breach of implied warranty. It sought damages for replacement costs, lost profits and loss of goodwill.

Prior to the filing, on August 4, 1988, Guardsman notified McAlear about the potential claim. McAlear sent notification to both Northland and ITT Hartford ("Hartford"), Guardsman's insurance carrier prior to Northland. However, when the complaint was filed in September, it only alleged sales from September 1983 to November 1984, the period in which Guardsman was covered by the Hartford policy. Accordingly, Hartford retained counsel, in California, from the law firm Murchison & Cumming, to defend the suit.

Attorney Steven Smilay of Murchison & Cumming represented Guardsman in the *CorryHiebert* suit. It became apparent, during discovery, that some of the sales in question occurred during the Northland policy period. As a result, on May 17, 1990, Attorney Smilay notified Northland of its possible liability. Although it was sent this additional notification, Northland did not participate in the defense of Guardsman, opting instead to continue to monitor the case through the counsel retained by Hartford. On August 9, 1990, Northland sent a letter to Attorney Smilay informing him that Attorney Bryon Hollins was now assigned to monitor the *CorryHiebert* suit on behalf of Northland, and that all correspondence and information regarding the case should be sent to his attention.

On July 30, 1991, the district court dismissed, on summary adjudication, CorryHiebert's damage claim for lost profits. Thereafter, in accordance to defense counsel's recommendation, the parties agreed to submit the suit to arbitration before retired Judge Gerald J. Lewis. The agreement provided that CorryHiebert would be entitled to appeal the district court's dismissal of the lost profits claim. On June 10, 1993, judgment was entered in favor of CorryHiebert and the amount of $480,882 was awarded for rework damages. CorryHiebert appealed the district court's decision regarding the lost profits claim. In June 1994, Judge Lewis reinstated the lost profits claim finding that the district court erred in granting summary judgment.

Prior to the arbitration agreement, Guardsman asked for assurances from defense counsel that coverage would exist for the claims being submitted to Judge Lewis. On November 30, 1992, Attorney Smilay wrote to a Guardsman's officer stating that the various insurance companies involved with this case approved the submission of the *CorryHiebert* suit to arbitration and that coverage should not be an issue. Northland was not identified as one of the carriers contacted by Attorney Smilay; however, a copy of the November 30, 1992 letter was sent to Attorney Hollins.

On the newly revived issue of lost profits, Guardsman, CorryHiebert, and the insurance carriers coordinated a settlement conference. Northland was invited to participate in the settlement negotiations. In a February 14, 1995 letter, Northland notified Guardsman that although it agreed to contribute $500,000 to the settlement, it was reserving its right to recover the $500,000, stating that

> [i]t is our belief that all claims with potential for coverage have already been disposed of and, further, that lost profits would not be covered by the Northland policy.... We reserve the right to file a Declaratory Relief Action to resolve the question of coverage which exists at this time, and any other coverage issues which come to light in the future.

(J.A. at 368–369.)

In April of 1995, Guardsman agreed to settle the lost profits claim by paying CorryHiebert $1 million—$50,000 of which would come from Guardsman pursuant to the SIR provision in the Northland policy; $500,000 from Northland; and $450,000 from American Empire.

After the settlement, Northland filed suit against Guardsman in the U.S. District Court

for the Central District of California seeking a declaratory judgment, reimbursement, and specific performance. The case was eventually moved to the Western District of Michigan pursuant to 28 U.S.C. § 1404(a). After discovery, both parties filed cross-motions for summary judgment. On September 25, 1996, the cross-motions were heard before Judge Robert Holmes Bell. On October 1, 1996, the court granted Guardsman's motion and denied Northland's motion, finding that Northland was estopped from denying coverage under the policy. On October 11, 1996, Northland filed a motion for reconsideration which was denied by the court on November 19, 1996. Northland filed a timely notice of appeal on December 18, 1996.

## II. Discussion

### A. Standard of Review

"We review the district court's grant of summary judgment de novo, using the same standard as that used by the district court." *Taylor v. Mich. Dep't of Corrections,* 69 F.3d 76, 79 (6th Cir.1995).

> Summary judgment is appropriate when 'there is no genuine issue of material fact.' Fed.R.Civ.P. 56(c). The moving party bears the initial burden of proving that no material facts exist, and the court must draw all inferences in a light most favorable to the non-moving party. A court may grant summary judgment when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.' Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial.

*Agristor Fin. Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (citations omitted).

### B. Choice of Law

Northland first argues that the district court failed to determine which state's law governs the interpretation of the policy at issue. Specifically, Northland asserts that instead of the lower court referring, in its October 1, 1996, opinion, to both Michigan and California law without making a proper determination as to which state's law con-trolled, the lower court should have concluded that California's substantive law applied. Northland contends that if California's law was applied by the lower court, its motion for summary judgment would have been granted, because pursuant to California law, lost profits does not constitute "property damage". Thus, Northland asserts that the settlement was not covered under the policy, and therefore, it had no duty to pay. Because the outcome would have been the same under estoppel principles, regardless of whether the motion for summary judgment was decided pursuant to Michigan or California law, a choice of law determination is not necessary. However, we have taken it upon ourselves to make a determination.

We review the district court's choice of law decision de novo. *MacDonald v. General Motors Corp.,* 110 F.3d 337, 341 (6th Cir.1997). Northland originally filed suit in the U.S. District Court for the Central District of California. The suit was then transferred to the Western District of Michigan pursuant to § 1404(a). The transferee court must apply the law of the state where the suit was originally filed, including that state's choice of law rules. *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964). Thus, California's choice of law rules apply.

California has a statute that deals with choice of law conflicts arising out of the interpretation of contracts. Cal. Civ.Code § 1646. § 1646 states that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." It would appear, based on this statute, that Michigan's law applies. Guardsman sold its products worldwide and had manufacturing plants throughout the United States, hence, the policy was to be performed in several places. However, the policy does not indicate one particular place of performance; thus, the law that governs is the law where the contract is made. Guardsman negotiated the policy with McAlear in Michigan, McAlear billed Guardsman for the insurance premiums in

Michigan and Guardsman sent its payments to McAlear in Michigan. Clearly the contract was made in Michigan, therefore, it would appear that Michigan's law applies. However, the California Supreme Court "has moved away from the mechanical application of § 1646. California now employs what is commonly termed the 'governmental interest analysis' approach to choice-of-law questions." *Rosco, Inc., v. TIG Ins. Co.,* 1996 WL 724896 (N.D.Cal.1996) (citations omitted). Under this approach California's law would apply.

Under the governmental interest approach, "the forum in a conflicts situation 'must search to find the proper law to apply based upon the interests of the litigants and the involved states.'" *Offshore Rental Co., Inc., v. Continental Oil Co.,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 869, 583 P.2d 721, 722 (1978). If the laws of the two states are identical, there is no conflicts problem. *Id.* 148 Cal.Rptr. at 870, 583 P.2d at 724. Moreover, if a conflict does exist between the two states, there is still no problem if only one of the states has a legitimate interest in having its law applied. *Id.* However, if both states have a legitimate interest in having its law applied, we are then faced with a true conflicts case. *Id.* at 871, 583 P.2d at 725. In the event of a true conflict, the forum will seek to resolve the conflict by utilizing the comparative impairment approach. *Id.* at 872, 583 P.2d at 726. Under this approach, the true conflict "should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." *Id.*

■ Accordingly, we must first determine what the law is in the respective states regarding the issue at hand; principally whether lost profits are, for purposes of the products liability policy, considered property damage. Because this is a diversity action, we must apply the law of the state's highest court. *Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981). However,

> [i]f the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it. If the state appellate court announces

a principle and relies upon it, that is a datum not to be disregarded by the federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Id.*

The Supreme Court of California has held that the word property, within the meaning of a casualty insurance policy, does not encompass lost profits. *Geddes & Smith, Inc., v. Saint Paul–Mercury Indem. Co.,* 51 Cal.2d 558, 334 P.2d 881, 885–886 (1959). On the other hand, the Michigan Court of Appeals has held that when a policy has the language: "[t]he company will pay on behalf of the insured *all sums which the insured . . . shall become legally obligated to pay as damages because of . . . property damage . . . .*" That provision in the policy, should be interpreted as covering all direct and consequential loss. *Dimambro–Northend Assoc. v. United Constr., Inc.,* 154 Mich.App. 306, 397 N.W.2d 547, 550–551 (1986) (emphasis added). The *Dimambro–Northend* court concluded that lost profits were covered as a consequential loss. *Id.* Because we find nothing to suggest that Michigan's Supreme Court would rule otherwise, we give credence to the Michigan Court of Appeals' determination that lost profits are covered, in certain circumstances, as a consequential loss.

In the case at hand, the policy has the above stated language; thus, pursuant to Michigan law, lost profits would be covered. Therefore, a conflict does exists between the two states. We must now examine whether either state has a legitimate interest in having its law applied.

California has a legitimate interest in having its law applied, since the injured party was a California resident, and the defective lacquer that caused the injury to the plaintiff was sold and delivered in California. Michigan as well has a legitimate interest in having its law apply; it wants to ensure that its insureds receive the benefit of their bargain. Here, the policy clearly states that Northland will pay "all sums which the insured shall become legally obligated to pay . . . ." Michigan has interpreted this provision to include lost profits. Therefore, if California's law applied, this coverage would be excluded.

It is apparent that both states have a legitimate interest in having their law applied; hence, we are faced with a true conflicts case. We must therefore resolve this conflict by applying the law of the state whose interest would be the more impaired if its law were not applied. It would appear that California's interest would be the more impaired; and thus, its law should be applied.

In the case at hand, the injured party, CorryHiebert, was a California resident, and the defective product was sold and delivered to CorryHiebert's California plant. Under these circumstances, Guardsman and its insurers would reasonably expect that California's law would apply. *See Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.,* 14 Cal.App.4th 637, 17 Cal.Rptr.2d 713 (Cal. Ct.App.1993). Moreover, the damage award, and the lost profits appeal was decided pursuant to California law, and Guardsman asked the district court to apply the California Uniform Commercial Code, (See J.A. at 176–78); thus, for the sake of consistency, California law should apply. It seems clear that California's interest in having its policies implemented far outweigh any interest that Michigan might have. We therefore hold that California's law applies.

Thus, lost profits are not covered by the policy. However, this fact, in and of itself, does not change the lower court's holding that Northland was estopped from denying coverage under the policy; therefore, Guardsman's motion for summary judgment was properly granted. *See infra* Part II.D.

## C. Scope of Policy

Northland next argues, in the alternative, that Guardsman's liability to CorryHiebert was for a claim not covered by the policy. Guardsman was found liable for breach of an implied warranty of fitness, a contractual claim. Northland asserts that its policy does not cover such claims. Thus, Northland contends that it is entitled to summary judgment, because like the lost profits claim, contractual claims are not covered under the policy, asserting that its policy with Guardsman only covers liability for torts.[2] We disagree.

Contract interpretation is a question of law subject to de novo review. *Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir.1995). In California, an insurance policy is a contract, subject to the same rules of interpretation as all contracts. *Fireman's Fund Ins. Co. v. Superior Court,* 57 Cal. App.4th 1252, 1259, 67 Cal.Rptr.2d 585 (Cal. Ct.App.1997). Accordingly, "[i]f contractual language is clear and explicit, it governs." *ACL Tech., Inc. v. Northbrook Property and Cas. Ins. Co.,* 17 Cal.App.4th 1773, 1784, 22 Cal.Rptr.2d 206 (Cal.Ct.App.1993).

The policy in issue defines the term "products hazard" to include "property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto...." (J.A. at 622.) Moreover, the policy specifically states that warranties of fitness or quality are not excluded from coverage:

Exclusions

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement; *but this exclusion does not apply* to a warranty of fitness or quality of the named insured's products....

(J.A. at 631.) (emphasis added).

Thus it is clear from the plain language of the policy that liability for warranty of fit-

**2.** Northland specifically argues that the policy's language "legally obligated to pay as damages" has been interpreted by California courts to refer only to tort damages. In support of this contention, Northland has cited to various cases, including, *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361 (9th Cir.1991), and, *Fireman's Fund Ins. Co. v. City of Turlock,* 170 Cal.App.3d 988, 216 Cal.Rptr. 796 (1985). These cases do not involve products liability coverage, which is the coverage at issue in this case.

However it should be noted that a products liability policy "usually covers hazards described as accidents arising out of the use of ... a *warranty* of products sold or distributed by the insured, with specified exclusions." *Fresno Economy Import Used Cars, Inc. v. United States Fidelity & Guar. Co., Inc.,* 76 Cal.App.3d 272, 285, 142 Cal.Rptr. 681 (Cal.Ct.App.1977) (emphasis added).

ness is covered; and therefore, within the scope of the policy.

## D. Estoppel

Finally, Northland contends that the lower court erred in holding that it was estopped from denying coverage for three distinct reasons: 1) Northland was an excess insurer under the policy and thus had no duty to earlier reserve its right; 2) Northland did not participate in Guardsman's defense and owed no duty to defend Guardsman under the policy; and 3) there was no evidence of prejudice, and prejudice cannot be presumed. We hold that all of these claims are without merit; thus, the lower court properly granted Guardsman's motion for summary judgment.

### 1. Primary Insurance

■ Northland contends that, as a matter of law, a primary policy is excess when it contains a SIR. Specifically, Northland argues that under the Details of Reinsurance Afforded, Item 5 refers to Item 3, the $50,-000 SIR, as primary insurance. *See supra* Part I. It asserts that, since Guardsman did not pay its required SIR payment of $50,000, until after it agreed to settle the lost profits claim, Northland's reservation of right was timely, noting that it is not until a primary policy is exhausted that an excess insurer has a duty to reserve its rights. *See State Farm Fire & Cas. Co. v. Jioras,* 24 Cal.App.4th 1619, 1626–27, 29 Cal.Rptr.2d 840 (Cal.Ct. App.1994). Northland relies heavily on *General Star Indem. Co. v. Superior Court,* in support of its proposition. 47 Cal.App.4th 1586, 55 Cal.Rptr.2d 322 (Cal.Ct.App.1996). However, Northland's reliance on this case is misguided.

*General Star* does not apply to the case at hand. In *General Star* the court resolved the SIR issue by referring to the plain language of the policy. The SIR endorsement stated that "This Endorsement Changes the Commercial Liability Policy. Please Read It Carefully." *Id.* at 1590, 55 Cal.Rptr.2d 322. Moreover, the SIR provided that "the terms of the SIR endorsement control '[i]n the event of· conflict with any provisions elsewhere in the policy.'" *Id.* The SIR also

expressly stated that "the limits of liability stated in the policy declarations 'shall apply in excess of your Self–Insured Retention....'" *Id.* Finally, the SIR further provided that the insurer "'shall have the right but not the duty to assume charge of the defense and/or settlement of any claim or 'suit' brought against [the insured].'" *Id.* The policy limit in *General Star* was $1 million dollars per occurrence. The SIR was $100,000 per occurrence. The court concluded, based on the language in the policy, that "the policy provided $1 million in excess coverage above a $100,000 SIR." *Id.* Moreover, the court found that the insurer only had a right, but not a duty to defend. *Id.*

■ This same clear wording is not found in the policy at hand. In the Northland policy, it states that "[t]he insurance afforded by this policy *is primary insurance, except when stated to apply in excess of* or contingent upon the absence of other insurance." (J.A. at 402.) (Emphasis added). Upon review of the record, we find nothing in the policy to indicate that the Northland policy is to apply in excess. Moreover, there is nothing in the policy that eliminates Northland's duty to defend. Nor does the GCI Certificate of Facultative Reinsurance, or the Hold Harmless Agreement, which Northland relies on, state that in the event of conflict in the policy, the SIR controls. Thus, when the language of a policy is clear and explicit, it must be given effect. *ACL Tech.,* 17 Cal. App.4th at 1784, 22 Cal.Rptr.2d 206. The Northland policy clearly states that it is primary insurance, as a result, "we will not strain to create an ambiguity where none exists"; thus, Northland's contention that its policy is excess is without merit, and must fail. *Fireman's Fund,* 57 Cal.App.4th at 1259, 67 Cal.Rptr.2d 585.

### 2. Duty to Defend

Northland next argues that because its policy was excess, it had no duty to defend prior to payment of the SIR. Moreover, it asserts that the district court erred by concluding that it indirectly participated in Guardsman's defense. Because we have already concluded that the Northland policy is primary, Northland had a duty to defend.

An insurer's duty to defend is broader than its duty to indemnify. *Val's Painting & Drywall, Inc. v. Allstate Ins. Co.*, 53 Cal.App.3d 576, 585, 126 Cal.Rptr. 267 (Cal.Ct.App.1975). The duty to defend arises when an insurer "ascertains facts which give rise to the potential of liability under the policy." *State Farm Mut. Automobile Ins. Co. v. Allstate Ins. Co.*, 9 Cal.App.3d 508, 526, 88 Cal.Rptr. 246 (Cal.Ct.App.1970). The insurer must defend, if the claims alleged, fall within the policy coverage. *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 17 Cal.Rptr.2d 210, 213, 846 P.2d 792, 795 (1993).

The Northland policy clearly states that Northland "shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage...." (J.A. at 410.) CorryHiebert, sought damages for breach of express and implied warranty. As stated previously CorryHiebert's claims for breach of warranty were within the scope of the policy, thus, Northland had a duty to defend. *See supra* Part II.C. Moreover, Northland became aware of the potential for liability in August of 1988 and May of 1990. In August of 1988, McAlear notified Northland of its potential liability. In May of 1990, Northland was again notified, this time by Attorney Smilay, of its potential liability; it was at this time, when it became apparent, that some of the sales in question were sold during the Northland policy. Therefore, because Northland had notice of potential claims, which were covered under the policy, in August of 1988 and May of 1990, its duty to defend arose, under the policy, at that time.

Northland contends, however, that even if it had a duty to defend, it did not defend the suit, and thus, the lower court's finding that it indirectly participated in the defense was in error. We disagree.

It is true that Northland did not provide counsel for the underlying suit, instead, Northland opted to monitor the case through the counsel retained by Hartford. We hold that Northland's decision to monitor the suit was, in essence, an indirect participation in Guardsman's defense.

In general, the relationship between insurer and insured is a fiduciary one. *Shultz Steel Co. v. Rowan–Wilson, Inc.*, 187 Cal.App.3d 513, 518, 231 Cal.Rptr. 715 (Cal. Ct.App.1986). Thus, Northland had a duty of good faith and fair dealing with Guardsman. *Id.* Accordingly, Northland had a duty to inform Guardsman, once it was aware of its potential liability, that it disputed coverage and was reserving its rights under the policy. However, Northland did not dispute coverage, or reserve its rights, until some seven years after its knowledge of the potential claim. During the underlying suit, however, Guardsman's defense counsel was shaping its litigation strategy. The way defense counsel ultimately postured its case was most likely based on several factors, one arguably, was the fact that Northland did not dispute coverage. If Guardsman knew that coverage would have been disputed, it probably would not have agreed to include in the arbitration agreement the right to appeal the lost profits claim, especially in light of the fact that another insurer, American Empire, had already reserved its rights as to that claim. Therefore, the lower court rightly concluded that Northland indirectly participated in Guardsman's defense by its failure to act.

### 3. Prejudice

Northland's final claim is that, even if its reservation of rights was untimely, estoppel still does not apply because there is no evidence that Guardsman was prejudiced in anyway, or relied to its detriment on Northland's failure to reserve it rights. Based on the aforementioned, this claim must fail.

Before submitting the case to arbitration, the lost profits claim was dismissed. By remaining silent, Northland, in essence, consented to the terms of the agreement, which allowed the revival of the lost profits claim. If Guardsman knew that Northland would contest coverage, it might have postured the case very differently. Northland's silence deprived Guardsman of the opportunity to fully assess its options, or the implications of Northland's reservation of rights. Thus, we hold that Guardsman was prejudiced from Northland's lack of notice. *See Stonewall*

*Ins. Co. v. Palos Verdes Estates,* 46 Cal. App.4th 1810, 1838–1839, 54 Cal.Rptr.2d 176 (Cal.Ct.App.1996) (holding that the insurer's untimely reservation of right prejudiced the insured).

Northland also argues that estoppel cannot be used to create coverage, where coverage did not exist. Specifically, Northland contends that since, under California law, lost profits would not have been covered under the policy, estoppel cannot be used to force non-existent coverage. If an insured, however, reasonably relies, to his detriment, on an unconditional defense, an insurer can be estopped from raising coverage defenses. *Jioras,* 24 Cal.App.4th at 1626, 29 Cal. Rptr.2d 840. Moreover, "[a]n insurer's assumption of the defense of its insured without giving notice of a reservation of rights may preclude the insurer from denying coverage because of that which could have been reserved." *Palos Verdes Estates,* 46 Cal. App.4th at 1838, 54 Cal.Rptr.2d 176.

In *Palos Verdes Estates,* the insurer defended the claims against its insured without asserting a reservation of rights. *Id.* at 1836, 54 Cal.Rptr.2d 176. Three weeks before trial, the insurer reserved its rights with respect to an inverse condemnation claim. *Id.* The insurer argued, as Northland does here, that the insured was not prejudiced because it knew that the policy did not cover the alleged claim. *Id.* at 1839, 54 Cal. Rptr.2d 176. The court held that the record supported both an inference of waiver and an inference that the insured detrimentally relied on its insurer's "nonassertion of a reservation of rights." *Id.* The court noted that the insurer's argument "miss[ed] the point. What the [insured] did not know was that [the insurer] was going to assert the inverse condemnation exclusion. So far as the [insured] knew, [its insurer] was not; and the [insured] was entitled to rely upon that justified assumption." *Id.*

Similarly in the case at hand, Northland entirely misses the point. As stated previously, Northland indirectly participated in Guardsman's defense. Northland, however, did not assert a reservation of rights until some seven years after its knowledge of the lost profits claim. In accord with *Palos*

*Verdes Estates,* we hold that such untimely notice operated as an inference of waiver as well as an inference of detrimental reliance. Consequently, Northland is now estopped from raising coverage defenses.

As it appears that all three contentions regarding the estoppel claim have failed, it was not improper for the lower court to grant Guardsman's motion for summary judgment.

## III. Conclusion

For the foregoing reasons we **AFFIRM**.