NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1078n.06

**No. 11-1043**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Oct 16, 2012***

DEBORAH S. HUNT, Clerk

NEW HAMPSHIRE INSURANCE COMPANY, )
)
    Plaintiff - Appellee, )
)
v. )
)
WILLIAM T. CARLETON, II, and URSULA )
ST. CLAIR, Representative of the Estate of )
LAYLA DIETZ, )
)
    Defendants - Appellants. )

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

**OPINION**

_____

Before:  **WHITE, STRANCH, and FARRIS,**[*] **Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Defendant-Appellants Ursula St. Clair,

representative of the Estate of Layla Dietz, and William Carleton, II, appeal the district court's grant

of summary judgment to Plaintiff-Appellee New Hampshire Insurance Company in this insurance-

coverage declaratory action.  We **REVERSE** and **REMAND**.

**I.**

A.    <u>Factual Background</u>

The salient facts of this case are not in dispute.  In September 2007, Carleton, an experienced

sailor, attended a regatta at the Bayview Yacht Club ("Bayview") in Detroit, Michigan.  Carleton

brought his Melges 24 boat, the Tiburon, from Virginia, where he then lived, to participate in the

_____

[*]The Honorable Jerome Farris, Circuit Judge for the United States Court of Appeals for the
Ninth Circuit, sitting by designation.

race. On September 22, around 3:30 p.m., Carleton's boat engine died. He noticed a rigid inflatable boat ("RIB") towing another boat, the Cujo. At Carleton's request, the RIB, owned by Tim Prophit, towed Carleton and the Tiburon back to Bayview to dock. Carleton and Prophit did not know each other and did not engage in any lengthy conversation, apart from the details of the tow and a thank you from Carleton.

Once at the dock, the boats were tied off to one another, as is common at boat races: the RIB was tied to the dock; the Tiburon to the RIB; and the Cujo to the Tiburon. Carleton testified that the only way to access the Tiburon was to walk across the RIB. To board the RIB, a person had to step down from the dock approximately one to two feet with no railing or fixture to hold onto for assistance. Although the two never explicitly discussed it, both Carleton and Prophit testified that when one boat is tied to another in the manner described above, the expectation is that a person has permission to cross one boat to gain access to the other. According to Prophit:

> I don't recall having a discussion say, yes, you can use the boat; no, you cannot use the boat. But in general when you're at sailing events where there's lots of visiting boats and boats are rafted off, it's kind of an unwritten, you know, social norm that people are allowed to cross over a boat they're rafted on to get to where they're going.
>
> Now, if you want to get [into] a discussion on etiquette on that, the correct seaman like, generally accepted rule is if you have to cross another boat, you cross the other boat, and you don't linger. You just – it's just getting from A to B.

PID 318/R. 15-3 at 30.

Later that evening, Bayview hosted a post-race party. Prophit had invited Layla Dietz, the decedent, and her sister to attend the party. Carleton met Dietz when she tripped and he helped her up. Dietz had several alcoholic drinks, became intoxicated, fell off her bar stool, and was asked to leave. Carleton left with Dietz and testified that Dietz said she wanted to see his boat. The two

2

walked down the dock toward the Tiburon and descended onto the RIB. They never made it onto the Tiburon, however; when they stepped down onto Prophit's RIB, they started kissing and eventually had sex on the RIB.

According to Carleton, he and Dietz were interrupted when Krista Paxton, a fellow racer, came aboard the RIB to retrieve an item from the Cujo, the other boat rafted to the RIB and the Tiburon. After she finished her errand, Paxton excused herself. Carleton testified that Dietz was embarrassed that they had been caught having sex and asked him to leave. He asked Dietz if she would be okay, and she responded that, although she wanted to sit for a moment, she would be fine. Dietz was reported missing the following day, and her body was discovered in the harbor two days later near where the Tiburon had been docked. The coroner's report listed drowning as the cause of death and noted that her blood-alcohol content was approximately 0.29.

B.      Procedural History

Ursula St. Clair, Dietz's mother and personal representative of her Estate, filed a wrongful-death action in Wayne County Circuit Court against Carleton, asserting claims of negligence and gross negligence. Carleton had two relevant insurance policies in effect at the time of the regatta, one of which was issued by Plaintiff-Appellee New Hampshire Insurance Company ("NHIC") and the other by non-party USAA Insurance Company ("USAA"). NHIC initially provided a defense under a reservation-of-rights based on an allegation in the complaint that some events may have taken place on Carleton's boat.

After Carleton testified under oath and revealed that the couple had never been on his boat, Susan Smith, the NHIC representative processing Carleton's claim, denied coverage based on the policy provision relating to Carleton's use of a non-owned vessel:

> COVERAGE FOR VESSELS YOU DO NOT OWN: We shall pay bodily injury and property damage arising out of your permissive use of a private pleasure vessel which you do not own or rent unless otherwise endorsed by us in writing.

NHIC denied coverage on the basis that the injury did not result from the "permissive use" of the RIB.

Throughout the litigation, Carleton's defense counsel submitted various materials to NHIC, including Carleton's deposition in which he testified that he had permission to use the RIB to get to his own boat, but NHIC continued to refuse coverage:

> We have reviewed the deposition transcript and do not see that the testimony of [Carleton] changes the situation regarding permissive use. Mr. Carleton clearly denied having permission to use the RIB for the activities that he and Ms. Dietz were engaged in before her disappearance. He admits that he never had any express permission to use the RIB for any purpose. At most, he states that he believed that he had a limited implied permission to use the RIB as a means of ingress-egress to his own vessel. Plainly, what he and Ms. Dietz were doing was not within the scope of that permission.

The underlying action between Dietz's Estate and Carleton settled on December 11, 2009, pursuant to three agreements, including a consent judgment entered by the Wayne County Circuit Court. The consent judgment provided for judgment against Carleton in the amount of $400,000. It further provided that (1) USAA would pay $100,000 to the Estate toward satisfaction of the judgment; (2) the Estate could only pursue enforcement of the remaining $300,000, plus interest, against NHIC; (3) Carleton conveyed any rights he had against NHIC to the Estate; and (4) the Estate could not enforce the consent judgment against Carleton. The consent judgment also provided that when the Estate collected the remaining $300,000, plus interest, or when all litigation to recover against NHIC was final, without regard to the result, the Estate would execute a satisfaction of

4

judgment.[1]  On February 26, 2010, the Estate and Carleton executed a covenant not to execute on the judgment.  The effect of the agreements is that Carleton is relieved of any personal financial liability to the Estate.

On December 7, 2009, NHIC filed this declaratory judgment action in the District of Maryland seeking a determination of its responsibilities under the policy.  The case was transferred to the Eastern District of Michigan on convenience grounds.  The parties filed cross-motions for summary judgment, and the district court heard oral argument on December 9, 2010.  The district court granted summary judgment to NHIC.  Appellants timely appealed.

## II.

The central issue in this lawsuit is whether Carleton's use of the RIB was "permissive."  The parties raise the preliminary issue whether Michigan or Virginia law should apply to determine the coverage issue.  But both parties effectively concede that there is no meaningful difference between Virginia and Michigan law when it comes to the interpretation of the insurance policy.[2]  Appellants' Br. at 27-28; Appellee's Br. at 14, 17.  As discussed below, we agree and therefore do not undertake a choice-of-law analysis.  *See Carbonic Prod. Co. v. Welding & Cutting Supply Co.*, 823 F.2d 553, at \*5 (6th Cir. 1987) (unpublished table decision) ("Moreover, conflict-of-laws rules are appealed

---

[1]Simultaneously with the consent judgment, the Estate and Carleton executed an assignment of any rights Carleton had against NHIC.

[2]The district court found that Michigan's choice-of-law principles apply to this case.  But because this case was transferred on convenience grounds, 28 U.S.C. §1404(a), there is good reason to question that determination.  *See Northland Ins. Co. v. Guardsman Prods.*, 141 F.3d 612, 616 (6th Cir. 1998) (noting that when a diversity case is transferred pursuant to 28 U.S.C. §1404(a), the "transferee court must apply the law of the state where the suit was originally filed, including that state's choice of law rules") (*quoting Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *see also Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990).  Nevertheless, the parties have applied Michigan's choice-of-law principles.

to only when a difference in law will make a difference to the outcome. Since Michigan and Ohio law are the same with respect to the issues presented on appeal, there is no conflict of laws.") (citations and internal quotations omitted)); *Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005) (unpublished opinion).

Both Michigan and Virginia treat insurance policies as contracts and require that terms be given their natural and ordinary meaning. *Rory v Cont'l Ins. Co.*, 703 N.W.2d 23, 26, 28 (Mich. 2005); *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 397 S.E.2d 876, 877 (Va. 1990). The ultimate objective in construing an insurance policy, as with any contract, is to determine the intent of the parties. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 456-57 (Mich. 2003); *State Farm Mut. Auto. Ins. Co. v. Powell*, 318 S.E.2d 393, 397 (Va. 1984). In both Michigan and Virginia, ambiguities in insurance policies are typically construed against the insurer and in favor of coverage. *Bituminous Cas. Corp. v. Sheets*, 389 S.E.2d 696, 698 (Va. 1990); *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W. 2d 475, 480 (Mich. 1996). This court reviews de novo "[q]uestions of contract interpretation, including those that form the basis for the grant of summary judgment." *Royal Ins. Co. v. Orient Overseas Container Line Ltd.*, 514 F.3d 621, 634 (6th Cir. 2008).

**III.**

The policy covers Carleton's "permissive use" of a boat that he does not own. The policy does not, however, define "permissive use." The district court held that the policy did not provide coverage:

6

> At most, Carleton had implied permission to traverse the dinghy[3] to access his sailboat, consistent with sailors' custom. Certainly, as Carleton admitted, he did not have permission to engage in sexual relations in Prophit's boat or to use the boat for any other purpose. Contrary to Defendants' argument, the implied permission to traverse the dinghy does not also provide Carleton implied permission to use the dinghy in any way he wished. Because Carleton did not have permission to use the dinghy, the policy does not provide coverage in this situation.

PID 524/R.19 at 4 (citation omitted).

The crux of the parties' dispute is whether Carleton's use of the RIB falls within the scope of the implied permission he unquestionably had. Although neither party cites, nor did our research uncover, any closely analogous cases, authority in both Michigan and Virginia suggests that whether a person is granted permission and, as a corollary, whether a person exceeds the scope of that permission, is typically a question for the fact-finder.[4]

The only Michigan case cited by either party, *Bronson Methodist Hosp. v. Forshee*, 499 N.W.2d 423, 425-28 (Mich. Ct. App. 1993), involved a "chain of permissive use" and inquired

---

[3]The district court used the term "dinghy" to refer to the RIB.

[4]Because there appear to be few cases addressing permissive use of boats and because "pleasure craft" insurance policies raise many of the same issues as automobile insurance policies, 6 Lee F. Russ & Thomas F. Segalla, *Couch on Insurance* § 137:96 (3d ed. 2005), most of the cases dealing with permissive use arise in the context of automobiles. *See generally Liberty Mut. Ins. Co. v. Markel Am. Ins. Co.*, No. 1:06-CV-812, 2007 U.S. Dist. LEXIS 64343, at *14 n.3 (W.D. Mich. Aug. 30, 2007) ("This court concludes that automobile cases are instructive in this area and that most courts would apply the same rules to watercraft insurance."). Indeed, both parties rely on cases involving automobiles. Similarly, the cases discussing permission—including those cited by NHIC in this appeal – almost always arise in the context of a state statute. *See, e.g., Auto Club Ins. Co. v. Buerkel*, Nos. 258051, 258240, 260775, 260781, 2006 Mich. App. LEXIS 802, at *10-11 (Mich. Ct. App. Mar. 21, 2006). Neither Michigan nor Virginia require boats to have insurance, however. *See Liberty Mut. Ins. Co.*, 2007 U.S. Dist. LEXIS 64343, at *15-17 (rejecting proposition that Michigan courts would equate "permission" in insurance policy with "consent" in owner's liability statute). Nevertheless, both parties rely on cases interpreting statutes as instructive in determining the meaning of the phrase "permissive use."

7

whether a claimant's use of a vehicle was "unlawful" under MCL § 500.3113(a). Neither of these issues are relevant to this case, and *Bronson* provides little guidance on the facts of this case.[5]

Michigan cases suggest that whether a person has permission to use another's vehicle—and the scope of that permission—is a question of fact that, if disputed, should go to a jury. In *Drielick v. Drielick*, for example, State Farm claimed that its insured, John Drielick, used a non-owned automobile outside the scope of the permission the owner of the vehicle had granted to him. 391 N.W.2d 435, 440 (Mich. Ct. App. 1986). The trial court granted summary judgment in State Farm's favor on that basis. The Court of Appeals reversed, explaining that, "[i]n this factual setting, we believe that the interpretation of the meaning of the policy exclusion language 'within the scope of the consent of the owner' and the application of such an interpretation to the facts in this case should be left to the trier of fact." *Id.* at 442. The court found a material factual dispute and that the trier of fact should be allowed to "determine the actual scope of defendant['s] . . . consent to . . . use of her car, and to decide whether the policy exclusion applies in this situation." *Id.*; *cf. Bieszck v. Avis Rent-A-Car Sys.*, 583 N.W.2d 691 (Mich. 1998) (question whether driver was driving with express or implied consent submitted to jury); *Fout v. Dietz*, 258 N.W.2d 53, 55 (Mich. 1977) (finding facts in case sufficient to rebut presumption of consent); *Roberts v. Posey*, 194 N.W.2d 310, 313 (Mich. 1972) (describing permission as a fact to be established); *Buerkel*, 2006 Mich. App. LEXIS 802, at *28-31.

Virginia law also suggests that the scope of permission is an issue for the trier of fact. Virginia courts resolve coverage questions involving permissive use by ensuring that a particular use

---

[5]After briefing and oral argument were complete, the Michigan Supreme Court overruled *Bronson*. *Spectrum Health Hosps. v. Farm Bureau Mut. Ins. Co.*, 492 Mich. 503 (2012) (published opinion not yet reported in N.W.2d). The *Spectrum Health* holding is likewise inapposite here.

8

is "consistent with the scope of the actual or implied permission from the named insured." *Gov't Emps. Ins. Co. v. United Servs. Auto. Ass'n*, 708 S.E.2d 877, 884 (Va. 2011); *see also State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, 43 Va. Cir. 419, 425 (Va. Cir. Ct. 1997) ("Permission to use a vehicle is not permission to use it for all purposes, including the permittee's own personal use.") (citation omitted). The Virginia Supreme Court explained in *Government Employees* that generally, whether a person has granted permission or whether a person has exceeded the scope of permission is "a factual issue to be resolved by the fact-finder." *Gov't Emps.*, 708 S.E.2d at 884; *see also Hartford Fire Ins. Co. v. Davis*, 436 S.E.2d 429, 431 (Va. 1993).

The principal case cited by NHIC, *Davis*, stands, at least in part, for the proposition that permission for one use does not imply permission for all uses. *See also* 6 Lee F. Russ & Thomas F. Segalla, *Couch on Insurance* § 113:1 (3d ed. 2005) ("[I]t is commonly stated that coverage under an omnibus provision depends upon the scope of the permission granted, and that, in each case, consideration of the scope of the permission is necessary because permission to use an automobile does not automatically extend to whatever use the permittee may make."). But NHIC's reliance on *Davis* is misplaced. First, consistent with *Government Employees*, the *Davis* court explained that the question of permission "is generally a question of fact." 436 S.E.2d at 431. Second, *Hartford Fire* is distinguishable. In *Davis*, the owner of the vehicle had given her mechanic permission to drive her car in order to repair it, but the court found no evidence at all that the purpose of the trip resulting in the accident was *related* to the repair of the vehicle. *Id.* at 430-32. Here, Carleton testified that the reason he and Dietz descended onto the RIB was that she wanted to see his boat, the same purpose for which they had implied permission.

NHIC focuses almost solely on Carleton's testimony that he did not have permission to be on the RIB "doing what they were doing," as well as Prophit's testimony that people do not "linger" when crossing others' boats and that he was surprised Carleton and Dietz used the RIB as they did. This argument is a red herring. The details of Carleton's and Dietz's sexual encounter add nothing to the determination whether Carleton had permission to have Dietz enter on and step off the RIB when she did. As both Carleton and Prophit testified, and as NHIC does not seriously dispute, Carleton and Dietz had implicit permission to cross the RIB to get to the Tiburon. Carleton testified that the reason they headed toward the docks was that Dietz wanted to see Carleton's boat. In order to see the Tiburon, it was necessary to come aboard the RIB and, obviously, to get back off of it. Although they did linger, there is no dispute that Carleton and Dietz had ceased having intercourse and that when Carleton left her, Dietz was sitting on the RIB. A reasonable inference from these facts is that Dietz fell into the water as she was attempting to leave. A rational trier of fact, therefore, could conclude that the reason that they got onto the RIB was to gain access to the Tiburon and that Dietz drowned while she was getting off the RIB, a use for which Carleton also had implicit permission.

Accordingly, we reverse the district court's grant of summary judgment.

## IV.

This leaves the issue whether the provisions of the consent judgment—limiting the Estate's recovery of the remaining $300,000 to collection under the insurance policy and foreclosing recovery from Carleton personally—operate to relieve NHIC from its indemnity obligation under the policy. Because the district court granted summary judgment to NHIC on the issue of coverage, the court did not address whether Carleton was "legally obligated to pay" money to the Estate as the Policy

10

requires. NHIC argues that Virginia law applies and would not find coverage under these circumstances. Relying on *Hitt v. Cox*, 737 F.2d 421, 426 (4th Cir. 1984), NHIC asserts that under the terms of the consent judgment, Carleton will not have to pay money to the Estate and, therefore, Carleton is not "legally obligated to pay" under the Policy.[6] The Estate responds that Michigan law applies and that the consent judgment was carefully crafted to comply with Michigan law.[7]

We note that it may well be that as with the issue of permissive use, there is little difference between Virginia and Michigan law when it comes to the effect of such consent judgments on an insurer's indemnity obligation. Although *Hitt* purports to apply Virginia law, it does not cite a single Virginia case in support of its holding. *Id.* (citing cases from North Carolina, Georgia, and Oregon); *see also Stonehenge Eng'g Corp. v. Empl'rs Ins. of Wausau*, 201 F.3d 296, 302, 306 (4th Cir. 2000) (relying on *Hitt* but applying South Carolina law). In contrast, more recent Virginia state cases appear to find such consent judgments enforceable as against the insurance carrier. *Beckner v. Twin City Fire Ins. Co.*, 58 Va. Cir. 544, 547-49 (Va. Cir. Ct. 2002); *see also Liberty Mut. Ins. Co. v. Eades*, 448 S.E.2d 631, 633 (Va. 1994). Michigan courts have reached the same conclusion. *Clay v. Am. Cont'l Ins. Co.*, 531 N.W.2d 829, 831-32 (Mich. Ct. App. 1995) (per curiam) (noting that

---

[6]NHIC argues that the consent judgment provides that no matter the outcome of this lawsuit, once the coverage issue has been determined, the Estate must execute a satisfaction of judgment in favor of Carleton. But NHIC's counsel effectively conceded at oral argument—and the terms of the consent judgment make clear—that no satisfaction will be entered *until* the litigation is resolved.

[7]Although neither party raises this issue, the Michigan Supreme Court has not foreclosed the use of depecage, the doctrine by which a court applies the laws of different states to different issues in the same case. *See Olmstead v. Anderson*, 400 N.W.2d 292, 293 n.3 (Mich. 1987); *see also Dow Chem. Co. v. Reinhard*, No. 07-12012-BC, 2008 U.S. Dist. LEXIS 12358, at *32-34 ( E.D. Mich. Feb. 20, 2008) (applying Delaware law to one issue and Michigan law to a later issue). Other states embrace the doctrine. *See, e.g.*, *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 649 (Md. 2007).

11

similar consent judgment did not eliminate liability).  In any event, we decline to address the issue and remand to give the district court the opportunity to consider it in the first instance.

**V.**

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for proceedings not inconsistent with this opinion.