Filed 2/1/16  The Doe Run Resources Corp. v. The Fidelity & Casualty Co. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE DOE RUN RESOURCES CORPORATION,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>THE FIDELITY & CASUALTY COMPANY OF NEW YORK,<br><br>     Defendant and Respondent. | G050689<br><br>(Super. Ct. No. 30-2008-00180034)<br><br>O P I N I O N |

          Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss, Judge.  Affirmed.

          Abelson Herron Halpern, Marc D. Halpern and Heather L. Mayer for Plaintiff and Appellant.

          Troutman Sanders, Thomas H. Prouty; Troutman Sanders, John R. Gerstein and Patrick F. Hofer for Defendant and Respondent.

## I.  INTRODUCTION

In the early 1980's, California's Irvine-based Fluor Corporation (Fluor) acquired Missouri-based St. Joe Minerals Company (St. Joe).  As a result of that acquisition, insurance coverage disputes arising out of St. Joe's mining operations in Missouri have, like comets, visited this court once a decade since the 1990's.[1]  This third arrival, concerns a dispute over whether St. Joe – now known as the Doe Run Resources Corporation[2] – was obligated to obtain the consent of one of its 1970's excess insurers, Fidelity & Casualty of New York,[3] before settling a Missouri environmental pollution class action suit for $55 million.  As with the last time St. Joe was in this court, we find ourselves in the position of having to make our best guess as to how the Missouri Supreme Court would decide the matter before us.  (See *St. Joe II, supra*, at fn. 3.)  This time, however, we have the advantage of direct guidance on the question from the Missouri Supreme Court itself, by way of *Johnston v. Sweany* (Mo. 2002) 68 S.W.3d 398.

As we explain below, *Johnston v. Sweany* is dispositive of this case.  In fine, the Missouri Supreme Court said the holder of a liability policy cannot present to a liability insurer a fait accompli in the form of a done-deal settlement of a case in

---

[1]  The first one was at the end of the decade, *St. Joe Minerals Corp. v. Zurich Ins. Co.* (Sept. 29, 1999, G018280) [nonpub. opn.] (*St. Joe I*).  *St. Joe I* didn't address the coverage issue directly, because it held that a summary adjudication that a primary liability insurer had a duty to defend various administrative proceedings initiated by the federal Environmental Protection Agency, without a corresponding order requiring some sort of payment of money, was not appealable under California's one final judgment rule or the collateral matter exception to it.  (See *Ca Ct. App. Declines to Hear A "Fraction" of an Insurer's Appeal Duty to Defend* (1999) 9 Andrews Ins. Coverage Litig. Rep. 857.)

Then came *St. Joe Minerals Corp. v. Zurich Ins. Co.* (Feb. 22, 2002, G025002) [nonpub. opn.] (*St. Joe II*).  By the time *St. Joe II* was decided, the trial court had made an order requiring actual payments pursuant to the primary insurer's duty to defend, so *St. Joe II* directly addressed the issue not addressed in *St. Joe I*, namely whether administrative actions qualified as "suits" against an insured for purposes of the duty to defend.  Our high court, in *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 (*Foster-Gardner*) had said no, and most of *St. Joe II* was taken up with explaining why we thought the Missouri Supreme Court would be persuaded by the reasoning in *Foster-Gardner*.

[2]  We will generally refer to the plaintiff as "Doe Run" except where the context requires reference to its former name.

[3]  Fidelity & Casualty of New York has since been acquired by Continental Insurance Company.  The parties refer to the defendant entity as "F&C," and we will follow suit.

contravention of an insurance policy's consent clause. Doing so forecloses the liability insurer from the "opportunity" of *disputing* the amount of damages. That is, under Missouri law, sufficient prejudice by itself. (*Id*. at p. 402.) Accordingly, we affirm the trial court's judgment dismissing Doe Run's action for declaratory relief against F&C.

## II.  FACTS

In 2001, residents of Herculaneum, Missouri filed a suit against Fluor and Doe Run alleging environmental damages from St. Joe's lead and cadmium smelting in the late 1970's. This suit is known in the record as the "Doyle action." The Doyle action appears to have been quiescent for a good portion of the 2000's, but by 2010 had been certified as a class action with trial scheduled to begin on October 11, 2011. Zurich Insurance Company had been St. Joe's primary liability insurer from the early 1950's through the mid-1980's. By the fall of 2011, it was providing a defense of the action, albeit under a reservation of rights. Thus it was unclear, from Doe Run's vantage point, whether or how much coverage Zurich might provide to fund any settlement of the action, and thus whether any excess insurance would be triggered. For its part, Doe Run had notified F&C of the Doyle action back in 2001, but as excess insurer, F&C was not participating in its defense.

On September 1, 2011, coverage counsel for Doe Run wrote coverage counsel for F&C to update F&C on the status of the Doyle action. Preparatory to trial, a mediation had been scheduled for Tuesday, September 6 – five days from the date of letter.[4] The letter was decidedly equivocal about whether the mediation might result in a settlement, or, if it did, whether any settlement of the Doyle action would involve invading F&C's excess coverage. The letter did say that *if* a settlement involved excess coverage, Doe Run would "look to" F&C's policies for it. But that was it as far as any warning to F&C was concerned. So the communication could be regarded as equivocal.

_____

4　　The letter was sent both regular mail and via email, on Thursday, September 1, 2011, at 5:17 p.m. Pacific time.

3

We reproduce all seven paragraphs of it in the margin.[5]  We may also note that the letter

set out no figures, probabilities, or theories that might have allowed F&C to gauge

anything about (1) Doe Run's probable exposure to the Doyle plaintiffs or (2) F&C's

exposure to a claim for coverage in excess of what Zurich might provide.  Rather the

---

[5]      We italicize portions of the letter emphasizing the uncertainty of whether F&C's excess coverage might be needed:

"As you know, we are coverage counsel for The Doe Run Resources corporation (formerly St. Joe Minerals Corporation, formerly St. Joseph Lead Company) ("Doe Run").  Your client CNA issued liability coverage for Doe Run including, but not limited to, The Fidelity & Casualty Company of New York excess policy no. LX1218608.  Since our clients are both involved in a litigation in other matters (though not in adverse position at the moment), out of caution we are providing this communication to CNA thru you as their counsel.  In the event a direct communication is appropriate, please let us know who we should address going forward, and in the meantime please forward this email to the appropriate recipient(s).

"We write to provide an update regarding the case captioned James Doyle et al. v. The Doe Run Resources Corporation et al., Case No. 012-8641, City of St. Louis Circuit Court, Missouri.  Materials and information regarding the case previously have been provided.  In synopsis, Doyle is a damage and injury class action against Doe Run and other defendants, filed on or about July 9, 2001, concerning a class of former and current property owners in the vicinity of Doe Run's long-operating lead smelter in Herculaneum, Missouri.  The Doyle case is prosecuted by a counsel group led by the Gray, Ritter & Graham firm.  The Doyle class has been certified and noticed, and plaintiffs contend there are over 400 class members.  Trial currently is scheduled for 5 weeks starting October 11, 2011, before Judge Van Amburg.  A pre-trial conference is scheduled for October 3, 2011.

"Doe Run's defense in the case has been conducted continuously by the law firm Lewis, Rice & Fingersh, with Andrew Rothschild as the lead defense counsel.  Full coverage for the defense has been provided by Doe Run's primary CGL insurer Zurich Insurance Company (now Zurich-American Insurance Company), who issued Doe Run's primary coverage from at least 1952 to 1985.  It is Doe Run's understanding that another primary insurer, Hartford Accident & Indemnity Company, who issued policies providing coverage for Doe Run from approximately 1985 to 1987, also has been contributing to the defense coverage thru payments to Zurich.

"An initial pre-trial mediation was conducted between plaintiffs and Doe Run on August 2nd and 3rd, 2011, but with limited progress toward any resolution.  The parties have agreed to conduct a further mediation on September 6th.  *At this time it is impossible to determine whether the parties will be able to achieve settlement.  It is also unknown whether Doe Run's part of any such settlement would penetrate the excess layers of coverage, requiring funding from CNA under the above-mentioned policy.  Doe Run has requested Zurich's position regarding the amount of coverage available to fund settlement under the primary policies, but has not yet received a determination.  In the meantime, Doe Run has advised Zurich that if Zurich comes to believe that excess insurance may need to be involved, as the defendant primary insurer it should apprise those excess insurers of the circumstances and its position.*

"Since the further mediation is scheduled for this Tuesday, September 6th, and Doe Run still awaits coverage guidance from Zurich, in an abundance of caution and as a courtesy we are providing this status report.  Zurich has considerable information about the lawsuit, including copies of all the pleadings and discovery.  Should you require any further information about the Doyle lawsuit at this time, please feel free to obtain that information from Zurich with our permission.  The lead claims handler is Brad Rausa, brad.rausa@zurichna.com.

"*In the event that a settlement is achieved and Zurich contends that Doe Run's portion of the settlement exhausts applicable coverage under the primary policies, Doe Run will look to CNA's applicable policies for coverage (possibly including, but not limited to, the Fidelity policy number referenced above, but of course not including other policies unavailable pursuant to the parties' prior settlement).*  This will also be the case in the event of any adverse judgment against Doe Run, should the Doyle litigation not settle.

"Thank you for your attention to this matter, and please do not hesitate to contact me with any questions."  (Italics added.)

letter attempted to require the primary insurer *Zurich* to tell F&C if excess coverage would be needed.

The mediation of September 6 was a long one, and was still going the next day. Twenty minutes after midnight on September 7, Doe Run agreed to settle with the Doyle plaintiffs for an aggregate total of $55 million. The settlement was handwritten on a piece of paper, which contained a three-day rescission option for both plaintiffs and defendant: The settlement was "subject to" the approval of both Doe Run's CEO and the class action representatives. Those two sets of parties – but no others – would have until Friday, September 7, to approve the settlement. The settlement contained no provision for input of any kind from either the primary insurer Zurich or excess insurer F&C.

The record indicates that Doe Run did not tell F&C about the settlement until October 5, 2011, and only then in response to a status inquiry from F&C. On September 28, 2011, a Midwestern administrator for CNA pollution claims wrote Doe Run's coverage counsel about the Doyle case on F&C's behalf. It is clear from that letter the administrator had no idea the case had already settled. The point of the letter was: (our paraphrase) "please tell us what's going on," or, as the letter put it, "As noted previously, Continental has received very little information from Doe Run about Doyle." The administrator was apparently under the impression that Doe Run would not be seeking *any* indemnity from F&C. The administrator also included, at the end, a long list of (boilerplate) reasons why F&C might deny all coverage arising out of the Doyle litigation.[6]

F&C's letter drew an email response from Doe Run's coverage counsel sent at 7:08 p.m. on October 5 to the administrator. The short missive promised a further

---

[6]     In *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1777 (*ACL*), this court observed that liability insurance coverage issues concerning pollution claims had "sparked a legal war that has raged in both federal and state courts from Maine to California." It is not surprising, then, that a liability insurer like F&C might assert reasons to deny indemnification for liability for environmental pollution beyond a policy's cooperation clause.

response, and, almost as an afterthought, mentioned the little detail that the case had settled.[7]

Despite promising a further response and saying F&C would be hearing from Doe Run's coverage counsel soon, Doe Run did not contact F&C at all for more than four months. Indeed, the next contact wasn't really a contact at all – it was this lawsuit. Doe Run had filed an action against its primary insurer, Zurich, regarding the Doyle action; contacting F&C was a matter of adding F&C to the existing complaint.

A summary judgment motion was brought by F&C and heard in June 2014 based on the undisputed fact Doe Run had never asked for F&C's consent concerning the September 7, 2011 settlement of the Doyle action. Doe Run admitted it never asked F&C for consent. The trial judge granted the motion, resulting in the judgment that is the subject of this appeal.

## III. DISCUSSION

A. *The Consent Clause*

Back in the late 1970's, F&C wrote a policy of excess liability insurance (policy LX 1 21 86 08) to cover the period from February 1976 to February 1979. The insuring clause says "Policy Coverage [¶] to indemnify the insured for ultimate net loss which the insured shall become legally obligated to pay as damages, in excess of the applicable underlying or retained limit, because of: [¶] (a) Personal Injury [¶] (b) Property Damage [¶] (c) Advertising [¶] arising out of an occurrence." The phrase ultimate net loss as used in the insuring clause is, on the same page, defined as "the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of the

---

[7]     Here is the entirety of the substantive portion of the October 5, 2011 email: "Thanks for the letter. We are putting together a response, but have been underwater for the past few days. I expect you will be hearing from us soon (including some of the requested information). In the meantime all rights reserved regarding the substantive points in your letter, but wanted to make sure you knew that the case has settled, so the trial next week is off-calendar."

6

company, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses including attorney's fees, court costs and interest on any judgment or award and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance."

Structurally, the requirement of the insurer's consent is part of the definition of terms within the policy's *insuring* clause, as distinct from constituting an exclusion from coverage *otherwise* afforded. That point makes a difference in litigation. It is the *insured* who has the initial burden of showing whether a claim is within the insuring clause. Then it is the insurer who must bear the burden of showing that an exclusion applies to remove the coverage that would otherwise exist. That is the rule not only in California (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1185-1186 [insured bears burden of showing claim is within insuring clause, insurer bears burden of showing pollution exception to that coverage otherwise applies]) but also in Missouri (*Clarinet, LLC v. Essex Ins. Co.* (E.D. Mo. 2012) 2012 U.S.Dist. LEXIS 7300 (*Clarinet*)).

B.  *Missouri Law and Consent Clauses*

The determinative case here, *Johnston v. Sweany, supra*, 68 S.W.3d 398 involved a case where the policyholder of a liability policy settled without asking for his insurer's consent, and, as a result, there was no coverage. The facts were these: The policyholder, a contractor, did some repair work on a home. Three days later, a fire occurred at the home. The homeowners sued the policyholder. The policyholder did not tell his liability insurer about the litigation, and "eventually" signed a confession of judgment without telling the insurance company. A final judgment based on the confession was then entered in favor of the homeowners. (*Id*. at p. 400.) The homeowners then sued the insurance company seeking to enforce the judgment against

7

the tortfeasor's insurer, and the company successfully sought summary judgment based on the policyholder's failure to comply with various cooperation clause conditions in his liability policy, including this consent clause: "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (*Id*. at pp. 400-401.)

The *Johnston v. Sweany* court first noted that policy conditions requiring notice to the insurer and forwarding of suit papers as soon as practicable are "valid and enforceable" in Missouri. (*Johnston v. Sweany, supra*, 68 S.W.3d at p. 401.) The court added that while "ordinarily" the burden of showing compliance with the provisions of the policy is on the insured, if the question is whether the insurer "seeks to escape coverage solely" because of the insured's breach of a cooperation provision, the burden is then "upon the insurer to prove facts that would make that provision relieve the insurer from liability." (*Ibid.*)

With that in mind, the *Johnston v. Sweany* court recounted the evidence showing the policyholder never made a claim on his policy and provided no notice of the underlying action to his insurer. The only notice of the homeowners' loss was provided by the policyholder's own agent filing a general liability loss notice. Moreover, it turned out the policyholder told the insurer that even the agent's notice was a mistake: he didn't want to make a claim on the policy because the actual work on the home was done by another company of the policyholder. (*Johnston v. Sweany, supra,* 68 S.W.3d at p. 402.)

A key fact noted by the high court: The insurer demonstrated on the motion for summary judgment that the policyholder "concurred in the confession of judgment assuming liability for the [homeowners'] loss without notifying [the insurer] or obtaining its consent." (*Johnston v. Sweany, supra,* 68 S.W.3d at p. 401.)

The court summarized the evidence on the summary judgment motion with the observation that the policyholder "did not comply with the provisions" of the policy (*Johnston v. Sweany, supra*, 68 S.W.3d at p. 402). The court then turned its attention to

the question of whether the insurer had shown "it ha[d] been prejudiced by the insured's non-compliance with such policy provisions" (*ibid.*). It said, "In this case, when Assurance first learned of the Johnstons' lawsuit, it was presented with a 'fait accompli.' Sweany, its insured, had already signed a confession of judgment accepting liability on behalf of all defendants in the Johnstons' lawsuit for the fire at the Johnstons' home. Sweany's failure to notify Assurance of the suit and forward all legal papers to Assurance, *in addition to his failure to obtain Assurance's consent before voluntarily assuming liability on behalf of all defendants, denied Assurance the opportunity to protect its interests.* Specifically, Sweany's failure to comply with these policy provisions *denied Assurance the opportunity to investigate the facts applicable to the subject of the lawsuit, to settle the dispute before trial, to defend against liability at trial, and to dispute the amount of damages*." (*Ibid.*, italics added.) The court held there was no insurance coverage available to satisfy the homeowners' negligence claim against the policyholder-contractor.

To be sure, as Doe Run now stresses, the policyholder in *Johnston v. Sweany* did not comply with the policy's cooperation provisions in several more ways than just not seeking the insurance company's consent for the amount of settlement. But those additional malfeasances do not vitiate the fact that court considered one of them – the violation of the consent clause – to be sufficient to terminate coverage.

It is revealing what the *Johnston v. Sweany* court did *not* do in regard to the insurer's need to show prejudice. The opinion does not, for example, say that the insurer had to present evidence that the amount for which the policyholder settled was too high, or to show that, hypothetically, the insurer could have kept the amount lower if it had been involved in the negotiation. It was the *exclusion itself* that constituted sufficient prejudice. The court was plain that the very fact of depriving the insurer of the "*the opportunity* to protect its interests" by disputing the amount of coverage carried the

9

insurer's burden of establishing prejudice so as to allow the insurer to "escape coverage." (*Johnston v. Sweany, supra,* 68 S.W.3d at pp. 401, 402, italics added.)

The rule from *Johnston v. Sweany* about the need to respect cooperation and consent clauses was followed by the Eighth Circuit applying Missouri law in *Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co.* (8th Cir. 2003) 325 F.3d 1024 (*Interstate Cleaning*), and by a federal district court applying Missouri law in *Clarinet, supra,* 2012 U.S.Dist. LEXIS 7300. Both cases are instructive. *Interstate Cleaning* involved the functional equivalent of excess insurance, since the liability coverage was structured so it would not be triggered until the policyholder had spent $50,000 for a single occurrence (or $300,000 in a year for multiple occurrences). (*Interstate Cleaning, supra*, 325 F.3d at p. 1026.) *Clarinet* shows a court willing to enforce the consent clause despite a pressing need on the part of the insured to spend money on shoring and repair costs to protect third parties.

In *Interstate Cleaning*, a Missouri-based commercial cleaning service firm was sued in Hawaii for sexual harassment, but didn't consider the suit important enough to be worth notifying its insurer. That made sense given that the policy had a self-insured retention of at least $50,000 and, as things would turn out, the plaintiffs would end up offering to settle before trial for $25,000, i.e., for an amount within the self-insured retention of at least $50,000.[8] But the cleaning firm rejected the $25,000, and went to trial. It ended up with a judgment against it so high (though the court did not quantify it) the trial court ordered a new trial unless the plaintiffs agreed to reduction by way of remittitur. (*Interstate Cleaning, supra*, 325 F.3d at p. 1027.) At that point the cleaning firm notified the insurer of the suit. In the harassment action an appeal was filed (it is not clear from the opinion by whom) and apparently during the pendency of that appeal the cleaning firm and the sexual harassment plaintiffs settled. A year after the notification,

---

[8] Readers may remember that the present case involves a requirement of liability in excess of a retained limit as well.

10

the cleaning service firm sued the insurer for having failed to defend and indemnify it. The case reached the Eighth Circuit after the district court entered a summary judgment in favor of the insurer. (*Ibid.*)

After determining to apply Missouri law, the *Interstate Cleaning* court held that the cleaning company's failure to notify the insurer did, indeed, prejudice it: "ICC failed to notify Underwriters of the Awais' lawsuit until after ICC defended the Awais' action, and rejected settlement before trial (Awais demanded $25,000), and until after the jury had rendered a verdict. As in *Johnston* [*v. Sweany*], this tardiness deprived Underwriters of the opportunity to investigate facts, to defend on liability, to settle the lawsuit, and to choose a trial strategy. By the time ICC notified Underwriters of the Awais' claims, Underwriters had already been prejudiced. The jury had already found ICC liable and established a value for the Awais' claims. The district court was correct, ICC failed to provide timely notice as required by the Policy, and Underwriters suffered prejudice from the delay." (*Interstate Cleaning, supra*, 325 F.3d at p. 1029, italics added.)

We glean two things from *Interstate Cleaning*. First is the fact the insurer there functioned like the excess insurer here (F&C): because of the self-insured retention there was no necessary requirement that the insurer *immediately* defend any (otherwise covered) claims against the insured. As in the present case a certain threshold had to be reached to trigger the coverage. And second, the court, as in *Johnston v. Sweany*, emphasized the loss of the *opportunity* to control costs as the essence of the prejudice. There was no need for the insurer to prove that, despite the loss of that opportunity, it might have done better if it had been notified.

In *Clarinet, supra*, 2012 U.S.Dist LEXIS 7300, a property developer purchased a historic building in St. Louis hoping to turn it into a mix of condominiums, retail stores and commercial space. (*Id.* at p. 2.) Then came a windstorm. A portion of the old building collapsed. The building had to be stabilized, and the policyholder

11

engaged in stabilization and shoring efforts that continued for several months. (*Id*. at pp. 3-4.) Despite them, the building eventually had to be demolished. The policyholder sought reimbursement for its stabilization and demolition costs, but the insurer denied them. (*Id*. at pp. 4-5.) Interpreting Missouri law, the court began its analysis by noting it is the insured who bears the initial burden of proving coverage, while the insurer bears the burden of showing an exclusion applies. (*Id*. at p. 13, citing *State Farm Mut. Auto. Ins. Co. v. Stockley* (Mo. Ct. App. 2005) 168 S.W.3d 598, 600.) After first ruling the policy's own property exclusion would exclude coverage for the costs even if done to mitigate damage to third parties (bricks and debris were causing damage to a nearby bridge),[9] the court turned its attention to the policy's consent clause (preventing the insured from "incur[ing] any expense other than for first aid, <u>without our consent</u>," *id*. at p. 9), noting the policyholder did not attempt to obtain the insurer's consent before incurring the disputed stabilization and demolition costs. (*Ibid*.) Citing both *Interstate Cleaning* and *Johnston v. Sweany*, the court held that the policyholder's "failure to notify or at least attempt to obtain consent from Essex prejudiced Essex in that Essex was foreclosed from investigating the extent of the damage to the Switzer Building, the need for stabilization and/or demolition prior to demolition, *or seeking more favorable demolition or stabilization contract terms.*" (*Id*. at p. 26, italics added.) Again, as in *Johnston v. Sweany*, depriving the insurer of the opportunity to seek a better deal was itself enough prejudice under Missouri law – the insurer didn't actually have to prove it might have been able to make a better deal.

In light of these cases, it is apparent that Doe Run's midnight (*literally* midnight) settlement with the Doyle plaintiffs, made without any consultation with F&C, was sufficient prejudice by itself under Missouri law. Doe Run's letter of September 1,

---

9      On appeal to the Eighth Circuit, the district court's judgment was affirmed, but solely on the owned property exclusion. (See *Clarinet, LLC v. Essex Ins. Co.* (8th Cir. 2013) 712 F.3d 1246 1249-1250.) Even so, the appellate court reaffirmed the federal district's observation that in Missouri it is the insured who bears the burden of showing a claim is within the insuring clause. (*Id*. at p. 1249.)

12

2011, was insufficient to have given F&C any meaningful warning its presence would be needed to approve any settlement, and there is no question Doe Run did not attempt to obtain F&C's consent.[10]

---

[10] There is a big difference between having the opportunity to reject a settlement and not having any such opportunity. Doe Run spends a good portion of its briefing discussing a complicated California case, *Fuller-Austin Insulation Co. v. Highlands Ins. Co.* (2006) 135 Cal.App.4th 958 (*Fuller-Austin*), but that case only illustrates the perils of not consenting to a settlement on an insured's behalf when the insurer *has* the opportunity, as distinct from never having the opportunity in the first place. And the facts in *Fuller-Austin* are unique, to say the least. The case involved the interaction of (1) a bankruptcy statute specifically addressed to asbestos cases (*id*. at p. 968, referring to 11 U.S.C. section 524(g)) with (2) the "obligations" of a group of excess insurers (*id*. at p. 966). To simplify as much as we can, though, *Fuller-Austin* is an example of a case where excess insurers *were* given the opportunity to consent to a settlement and (at their peril) refused to do so. (See *id*. at p. 983 ["Applying the foregoing legal principles to the undisputed evidence, the trial court found that Fuller–Austin *complied with its policy obligations by giving appellants notice of the settlement*, that appellants had a duty to Fuller–Austin to accept a reasonable settlement, and that they acted at their own peril by refusing to accept the settlement. In other words, by reserving their rights instead of acknowledging coverage and assuming the defense of the matter, appellants surrendered their right to rely on any policy provision requiring their consent to a settlement."].) Even assuming that the Missouri Supreme Court would import *Austin-Fuller* into Missouri law – and that's *not* by any means clear (see Jeffrey E. Thomas, *A Case Study of Bad Faith Refusal to Settle: A Doctrinal, Normative and Practical Analysis of Missouri Law* (1996) 64 UMKC L. Rev. 695 [discussing unanswered questions in Missouri bad faith doctrine]), in *Austin-Fuller* the excess insurers had a meaningful opportunity to evaluate a proposed settlement and chose to reject it. Here, F&C clearly didn't have that opportunity.

Another California case Doe Run relies on is *Diamond Heights Homeowners Assn. v. National American Ins. Co.* (1991) 227 Cal.App.3d 563, but, as in *Fuller-Austin*, that case involved a meaningful opportunity to evaluate a proffered settlement, not a fait accompli as we have before us now. Contrast the warning given the excess insurer in *Diamond Heights* with Doe Run's letter of September 1: "In November 1987, defense counsel advised Central's counsel that at a mandatory settlement conference, two primary carriers had committed their policy limits in the total amount of $1.5 million in settlement of the action, which offer, combined with $100,000 from other defendants, had been made to plaintiffs' counsel. He further advised that plaintiffs' counsel informed them that his estimate of repair costs, exclusive of asbestos abatement costs, exceeded $2 million and that asbestos abatement work would be costly. By letter dated November 5, 1987, defense counsel advised Central of plaintiffs' settlement demand of $2,671,064, and stated: 'Since this figure clearly exceeds the policy limits of St. Paul and Consolidated American, which limits have been "put on the table" (approximately $1,600,000), *your immediate statement of position is required. . . .* [¶] The trial remains set for Monday, November 9, 1987.'" (*Id*. at p. 575, italics added.) Moreover, in *Diamond Heights*, counsel for the insurer had sufficient time to evaluate the proffered settlement and object to it in open court. (*Ibid.*) That's a bit different from being told of a final settlement roughly a month after it was final.

13

C. *Doe Run's Arguments*

1. *The Argument from Sequence*

Doe Run posits three arguments that would have the effect of excusing compliance with the consent clause: The first is what we will call the argument from sequence. This argument theorizes that since it is fundamental that an excess insurer normally has no obligation to pay until the primary policy is exhausted,[11] and since Zurich disputed coverage and did not exhaust until well after the September 7 settlement, there was no occasion for Doe Run to obtain F&C's consent.

The argument from sequence fails because it assumes that the prerequisite of exhaustion of primary coverage has the effect of nullifying other prerequisites for, or conditions precedent to, coverage in the policy. Of course, courts resist interpretations of contracts, even insurance policies, that nullify terms in those contracts. (E.g., *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co., supra,* 17 Cal.App.4th at p. 1785 ["In California, however, contracts – even insurance contracts – are construed to avoid rendering terms surplusage."].) Doe Run's interpretation would, in effect, read out of all excess policies any conditions for coverage, including cooperation clauses, that exist in addition to the need for primary limits to be exhausted. But as we have seen, *Johnston v. Sweany* is clear that a consent provision in an insurance policy is enforceable in its own right. (Accord, *Mendota Ins. Co. v. Mills* (E.D. Mo. 2012) 2012 U.S.Dist. LEXIS 137965 at p. 5 [ "Cooperation clauses are valid and enforceable under Missouri law. . . . Similarly, provisions requiring that notice of an occurrence be given to the

---

[11] The qualification being, at least in California (see fn. 11 above), if the excess insurer *objects* to a proposed settlement.

14

insurer 'promptly' are valid and enforceable. . . . Failure to give the required notice will relieve the insurer of liability to the insured."].)[12]

Doe Run's second argument can be called the argument from retroactive non-prejudice. Doe Run's theory here is that summary judgment is not appropriate based solely on the admitted non-compliance with the consent clause, because F&C will *still* have the opportunity to establish prejudice from the $55 million settlement at trial in Doe Run's declaratory relief action. This theory ignores the realities of settlement, particularly *this* settlement, which was not achieved until after what was obviously an all-night bargaining session that continued past midnight. As every litigator knows, a settlement avoids the time, expense and opportunity costs of going to trial. (See J.J. Prescott et. al., *Trial and Settlement: A Study of High-Low Agreements* (2014) 57 J.L. & Econ. 699, 704.) Moreover, the probability of settlement of civil litigation will involve significant variables of subjectivity: the degree to which the competing litigants and lawyers are risk adverse, the degree to they have varying subjective beliefs about probable trial outcomes, and the degree to which they may – or may not – have equal information. (See *id*. at pp. 701-703.)

It follows then that *opportunities* to settle on favorable (or at least acceptable) terms may knock but once. Yet trying to reconstruct the conditions that existed in a Missouri courthouse or office building at midnight, September 7, 2011, – particularly the willingness of the Doyle parties to settle for an amount below $55 million

---

[12] A variation on the argument from sequence is an estoppel argument predicated on the idea that F&C basically told Doe Run, "don't bother us until the primary is exhausted." That argument fails because Doe Run cannot point to any place in the record where F&C clearly waived the consent provision in its policy. Missouri law requires a clear showing that an insurer "unequivocally and clearly" waived a policy defense (*Interstate Cleaning, supra*, 325 F.3d at p. 1030), and of course Doe Run presented no such evidence at the trial level.

15

– will be impossible. As we have seen from cases construing Missouri law, the excess insurer F&C is inherently prejudiced by not having had an opportunity to consent first.[13]

Doe Run's third argument is what one might call an argument from proactivity. Doe Run says, in essence: "Look, nothing actually *prevented* F&C from attending the September 6 mediation, and the company had access to all the public pleadings, so if F&C didn't consent to the settlement, it was, in effect, its own fault; it should have sent a representative who could have objected if the settlement was too high." In other words, F&C should have proactively inserted itself into the September 6 mediation. Having failed to do so, it cannot complain now.

This argument fails primarily because of the way the September 1 letter was written (one of the reasons we have reproduced all of it). First, the letter conveyed no substantive information about the relative probabilities and ranges of favorable and unfavorable prospects for the Doyle action. For all the letter told F&C, the Doyle litigation could have resulted in anything between a clean defense verdict or a class action judgment in the nine-digit millions. The letter gave no information about Doe Run's defenses, or the strengths of the Doyle plaintiffs' case. Second, the letter gave no estimate of the probabilities of settlement – whether the parties might be close, far apart, or whether the mediation was simply a rote exercise that had to be fulfilled prior to trial. The only warning it gave F&C was: *If* there's a settlement and *if* the primary isn't good for all of that settlement, then of course Doe Run would "look to" F&C for the rest. And, perhaps most tellingly but not obviously, the letter doesn't even tell the reader *where* the mediation would take place, or precisely when it would commence.

---

13      Doe Run asks we take judicial notice of a (well-reasoned) trial level order and judgment in another Doe Run environmental coverage dispute (*Doe Run Resources Corporation v. American Guarantee & Liability Insurance Company et al.*, cause number 10SL-CC01716 (*American Guarantee*)) from a St. Louis circuit (trial-level) court. We perceive the point of Doe Run's request being the insurer in *American Guarantee* suffered no prejudice, even if, contrary to the evidence, it was given late notice of the underlying suit because the insurer would have used the policy's pollution exclusion to deny all coverage anyway. We grant the request, but it doesn't do Doe Run any good. While F&C might have reserved its rights to contest coverage for a host or reasons, there is no evidence that F&C had already made up its mind to deny coverage regardless of its consent.

Under these circumstances, F&C could hardly have been expected to send a representative – literally uninvited – to a mediation at an undisclosed location.  Also significant:  Doe Run made no effort to afford F&C the opportunity though it might have done so in the context of the midnight settlement – for example, by extending the three-day rescission period which the agreement gave to its CEO and the Doyle class representatives expressly to its insurers.

## IV.  DISPOSITION

The judgment is affirmed.  F&C shall recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

17